1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF MARYLAND

3                       SOUTHERN DIVISION

4   UNITED STATES OF AMERICA,       ) CRIMINAL
                                    ) NO. PJM-15-258
5             Plaintiff,            )
                                    )
6   v.                              )
                                    )
7   SELVIN RAYMUNDO SALAZAR,        )
                                    )
8             Defendant.            )

9              TRANSCRIPT OF SENTENCING PROCEEDINGS
            BEFORE THE HONORABLE PETER J. MESSITTE
10               UNITED STATES DISTRICT JUDGE
             TUESDAY, JUNE 12, 2018; 3:09 P.M.
11                   GREENBELT, MARYLAND

12  APPEARANCES:

13  FOR THE PLAINTIFF:

14          OFFICE OF THE UNITED STATES ATTORNEY
            BY:  WILLIAM D. MOOMAU, ESQUIRE
15          BY:  FRANCESCA LIQUORI, ESQUIRE
            6406 Ivy Lane
16          Suite 800
            Greenbelt, Maryland  20770
17          (301) 344-0222

18  FOR THE DEFENDANT:

19          BRENNAN McKENNA & LAWLOR, CHARTERED
            BY:  MICHAEL E. LAWLOR, ESQUIRE
20          BY:  NICHOLAS G. MADIOU, ESQUIRE
            6305 Ivy Lane
21          Suite 700
            Greenbelt, Maryland  20770
22          (301) 474-0044

23  OFFICIAL COURT REPORTER:
    Renee A. Ewing, RPR, RMR, CRR - (301) 344-3227
24
       ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***
25

1          (Call to order of the Court.)

2          THE COURT:  Good afternoon, ladies and gentlemen.

3   Please be seated.

4          THE DEPUTY CLERK:  The matter now pending before the

5   Court is Criminal Case No. PJM-15-0258, The United States of

6   America vs. Selvin Raymundo Salazar.  The matter now comes

7   before the Court for a sentencing.

8          THE COURT:  All right.  Counsel, identify yourselves

9   for the government and defendant, please.

10          MR. MOOMAU:  Good afternoon, Your Honor.  William

11   Moomau and Francesca Liquori on behalf of the United States.

12          MR. LAWLOR:  Good afternoon, Your Honor.  Michael

13   Lawlor and Nicholas Madiou for Mr. Salazar.  He is present to

14   my left and assisted by the court certified interpreter.

15          THE COURT:  Swear the interpreter, please, madam

16   clerk.

17           SHELLEY BLUMBERG, INTERPRETER, SWORN

18          THE DEPUTY CLERK:  Please state your name for the

19   record.

20          THE INTERPRETER:  Shelley Blumberg, federal court

21   certified interpreter.

22          THE COURT:  In Spanish?

23          THE INTERPRETER:  In Spanish since 1991, federal

24   court certified.

25          THE COURT:  Very good.  Thank you.

1          Ladies and gentlemen, I am joined at the bench today with

2  Judge Yusuke Hirose from the Tokyo District Court in the

3  Tachikawa branch.  He is a criminal court judge visiting as a

4  fellow at the Federal Judicial Center, and we spent the

5  afternoon talking about sentencing guidelines, so having done

6  that, he is now observing.  He will not be a participant in the

7  proceedings, but he will be accompanying as we go forward.

8          That said, let's start with there are some motions to

9  seal that I have in front of me to take care of.  I haven't

10  signed all these yet.  I guess there was both the defendant's

11  and the government's sentencing memos.

12          Is that what the two motions to seal were?

13          MR. MOOMAU:  Yes, Your Honor.

14          THE INTERPRETER:  Your Honor, excuse me.  We had

15  checked this before, but this seems to be coming in and out.

16  We need to make sure --

17          THE COURT:  Fair enough.

18          THE INTERPRETER:  I think we are going to need some

19  new batteries for this one.  It had two of the little rows so I

20  thought it would be okay, or I can try one of these.

21          THE COURT:  All right.  Ms. Blumberg, I don't know

22  how much you got and how much you didn't get when I started.

23  Did you get identification of the Japanese judge?  Did you get

24  that?

25          THE INTERPRETER:  Yes, I did.

1          THE DEFENDANT:  Yes.

2          THE COURT:  Well, I was just saying, at this point, I

3   have two motions to seal pleadings, and I will sign those and

4   send them over to the clerk at this time.

5          We will start, then, if there is nothing that counsel has

6   preliminarily, to ask whether there are any issues with the

7   sentencing guidelines from the government, Mr. Moomau?  Who is

8   going to be speaking for the government?

9          MR. MOOMAU:  I will, Your Honor.  The government has

10  no issues with the, I guess the advisory guidelines range

11  calculations in the presentence investigation.

12         THE COURT:  Very good.

13      Mr. Lawlor.

14         MR. LAWLOR:  Your Honor, we have two, one which we

15  noted in our sentencing memo, which is a role reduction

16  regarding murder conspiracy, number one, and there is also an

17  issue of overrepresentation of the defendant's criminal

18  history, Your Honor.

19         THE COURT:  All right.  Well, let's specifically go

20  to those issues.  Can we go to a -- in the presentence report,

21  is there a paragraph number you want to go to on that?

22         MR. LAWLOR:  Your Honor, if I could work backwards,

23  regarding the overrepresentation of the defendant's criminal

24  history --

25         THE COURT:  All right.

1            MR. LAWLOR:  -- he was given two points at paragraph
2   53 for reentry of a deported alien --
3            THE COURT:  Yeah.
4            MR. LAWLOR:  -- a conviction he secured on August the
5   1st, 2014.  I think the government highlighted in its
6   sentencing memo that it doesn't object to a finding by the
7   Court that the government's criminal history -- that -- excuse
8   me, that the defendant's criminal history is overstated.
9   Factually, Your Honor, the defendant was arrested for that
10  offense.  The offenses in the instant case occurred before
11  August the 1st, 2014.
12           I believe, at the risk of speaking for Mr. Moomau, the
13  defendant's, at that time, alleged participation in MS-13 was
14  known to the government.  He has remained in custody since his
15  arrest in that case.  He served four months for a guilty plea
16  that occurred on August the 1st.  That sentence expired -- was
17  imposed and really expired in January of 2015.
18           A warrant had already been issued in Prince George's
19  County for some of the conduct that's part of the plea that
20  occurred in this case.  He was served with that warrant which
21  was acting as a detainer.  He went into custody in Prince
22  George's County until the government indicted the RICO case
23  here.  So he's never been released from custody.
24           I think the government was, at a minimum, investigating
25  Mr. Salazar for the conduct for which we are here today, so I

1  think, if you look at sort of the totality of the circumstances

2  here, it would be fair to say that the defendant should be

3  treated as a Criminal History Category I.

4          THE COURT:  Mr. Moomau.

5          MR. MOOMAU:  Your Honor, when we look at illegal

6  reentry cases, particularly when there is no felony conviction

7  to make it an aggravated felony, illegal reentry, one of the

8  things we look at is whether or not the person is associated

9  with a gang.  And in this particular case, that was one of the

10  strong considerations for the authorization of this particular

11  case.

12          Yes, the RICO investigation had started; yes,

13  Mr. Salazar's name had come up as a possible suspect in the

14  February 2013 murder, as well as the July 2014 attempted

15  murder, so for that reason, Your Honor -- I am not saying the

16  illegal reentry case was used as a tool to keep him

17  incarcerated and to get him arrested while an investigation

18  developed because it was entirely proper to do that, but those

19  matters were considered.  And because of that, I am not opposed

20  for I guess them being all considered as one and for his

21  criminal history category being deemed to be one just for the

22  purposes of this sentencing.

23          THE COURT:  Mr. Mebane, do you have any thought about

24  that?  Obviously, there was an illegal reentry here.  You are

25  asking me now to, what, ignore it, or exactly what that does to

1   the historical record, I don't know.

2           U.S. PROBATION OFFICER TURNER MEBANE:  Your Honor,

3   the way the guidelines are spelled out, they -- the prior

4   conviction has been accurately scored.  Defense counsel is

5   asking for overrepresentation, so they are asking for a

6   departure.

7           THE COURT:  Because -- that's where I think I am a

8   bit lost.  In other words, he did enter illegal -- reenter

9   illegally, and then I think I am understanding that since he's

10  been in custody ever since, somehow that should result in a

11  reduction of his criminal history?  I am not sure quite the

12  logic of that argument.

13       Mr. Moomau, can you enlighten me on that?

14          MR. MOOMAU:  Your Honor, I can't give any legal

15  grounds for it.

16          THE COURT:  Does it have some effect on the

17  guidelines score?

18          MR. MOOMAU:  No, it does not.

19          U.S. PROBATION OFFICER TURNER MEBANE:  Well, depends

20  on the role.

21          MR. MOOMAU:  Well, yes, it can, Your Honor.  It can

22  have an effect on his advisory guidelines range depending on

23  how the Court rules as far as if there is a minor or minimal

24  role reduction, yes, it could.

25          THE COURT:  Well, Mr. Lawlor, I am not sure why you

1   you think the Court should do this.  I mean, I haven't heard,

2   other than the fact that he's been in more or less continuous

3   custody, that he did not illegally reenter.  That's what he's

4   getting scored on.

5        Why do you say that overrepresents his criminal history?

6             MR. LAWLOR:  Well, Your Honor, first of all, I mean,

7   this type of departure is warranted in the guidelines under

8   4A1.3(b).

9             THE COURT:  Let me follow you on this so I can be

10  sure I understand what you are arguing on this.  4A what?

11            MR. LAWLOR:  1.3(b).

12            THE COURT:  Just a moment.  4A1.3(b).  Let me see it.

13       Well, what is the language in there that somehow applies?

14  I am understanding -- I understand the concept of a downward

15  departure.  Listen to my articulation of this.  He did

16  illegally reenter.

17            MR. LAWLOR:  No question.

18            THE COURT:  Crime committed.

19            MR. LAWLOR:  Correct.

20            THE COURT:  Ordinarily scored as a crime.

21            MR. LAWLOR:  Correct.

22            THE COURT:  You said -- well, you state for me what

23  your argument is as to why that should be ignored in effect.

24            MR. LAWLOR:  I am not -- there is no part of our

25  argument suggesting that it should be either ignored by the

1   Court or eradicated from the public record.  It is scored -- as

2   Mr. Mebane says, the guidelines permit a -- essentially a

3   departure.  As opposed to a departure on the base offense

4   level, a departure of criminal history category based on

5   overrepresentation, and we think --

6            THE COURT:  Why does it -- is -- if it's correctly

7   scored, why does it overrepresent his criminal history?

8            MR. LAWLOR:  I think -- and that's -- perhaps I

9   failed to articulate this, Your Honor, but that's where I think

10  the factual setting here is relevant.  I think had the

11  government's investigation in this case been further along, the

12  crimes in this case occurred before he was arrested on illegal

13  reentry, and I am not suggesting that government did anything

14  improper or untoward, but I think Mr. Moomau admirably admits

15  that the reentry case here, the decision of the United States

16  Attorney to bring that case was based in part on information

17  that the defendant was an MS-13 member and perhaps in part, if

18  I heard him correctly, Mr. Moomau, that the investigation of

19  Mr. Salazar was ongoing.

20       Now, had the timeline been slightly different and it had

21  been -- the RICO indictment handed down previous to the

22  necessity of -- I fear using the word placeholder in a criminal

23  case, but this -- I think part of what Mr. Moomau is saying is

24  that -- is that the decision to -- to obtain that indictment

25  was based on the information really surrounding the case for

1  which we are here today.  So I am not saying that he didn't

2  enter -- he did not enter --

3          THE COURT:  Would that not have been an independently

4  prosecutable offense?  Of course, it would have been.  And are

5  you saying that, for some reason, had he not been a member of

6  MS-13, he wouldn't have been prosecuted for the illegal

7  reentry?  That's where you are losing me.

8          MR. LAWLOR:  I think that was a better question for

9  Mr. Moomau, Your Honor.

10         THE COURT:  Well, that's where I think I am getting a

11 bit lost on this.  You are asking for a downward departure.  I

12 mean, overrepresentation of a criminal history is because maybe

13 the crimes are minor, and they don't really show in the case

14 that we are talking about that it requires any kind of

15 additional number, but here, I mean, what he has committed is

16 an independent, prosecutable offense.

17     I think I have seen cases where people have been

18 prosecuted for illegal reentry even when they are not MS-13

19 members.  Obviously, discretion is with the government whether

20 to go forward, but as far as, you know, following the

21 guidelines as written, I mean, they don't bind me ultimately.

22     But departures are not something I grant casually.  And

23 you are asking for a departure as overrepresentation.  I don't

24 think that's what you are saying.  You are asking me really to

25 somehow accommodate the fact that there is a relation between

1   one -- that crime and the crime he was convicted of.

2         MR. LAWLOR:  Well, that may be.  And, Your Honor, you

3   know, at the risk of foreshadowing the arguments to the next

4   guideline factor, you know, we are in a post book of worlds, so

5   to the degree that the Court thinks that a formal finding of

6   overrepresentation is a step too far, then I certainly would

7   ask the Court to factor this argument into --

8         THE COURT:  Well, I can certainly understand what you

9   are saying.  I don't really need more.  I think the guidelines

10  dictate at me giving this posture, recognition of the fact that

11  there was an illegal reentry and that there is no

12  overrepresentation with regard to that.  That crime is a

13  completed crime when he illegally re-enters.

14       Now, whether, because of some relation with MS-13, it

15  should have some ultimate impact, we will see, but I reject

16  that a offer -- a request, pardon me, at this point for a

17  change in the criminal history category.  It's a II.

18       Now, what's your other point?

19         MR. LAWLOR:  The other argument, Your Honor, sort of

20  just looping back around or beginning where we just fell off,

21  because I would be disingenuous I think if I didn't acknowledge

22  what I am about to argue is probably more appropriate for

23  consideration of the defendant's role in the murder

24  conspiracy --

25         THE COURT:  Well, you are arguing now that he's been

1   over scored, what, as a principle when he should be given less

2   points because he was not --

3           MR. LAWLOR:   In essence.

4           THE COURT:   Well, what's the number you are looking

5   at here?   Where are you looking for credit, what part of that?

6           MR. LAWLOR:   That is -- the Court's indulgence,

7   please.   3B1.2, Your Honor.

8           THE COURT:   Hold on.   Let me get to that, 3B1.2.

9   Decrease by two levels.   So that would be -- let me go back to

10  the calculation.

11          MR. LAWLOR:   We are at a 42 and then the adjustment,

12  so that would bring him --

13          THE COURT:   Right.   Well, but as I understand it --

14  Mr. Mebane, you can correct me -- it would be somewhere in the

15  30s, maybe 33 or something like that under specific offense

16  characteristics?   Where would you score a two-level decrease?

17          U.S. PROBATION OFFICER TURNER MEBANE:   You would take

18  it from the adjusted offense level, Your Honor, of a 42, and

19  subtract either the two or three points that defense counsel is

20  asking for, so it would be a 42 or a 39.

21          THE COURT:   At paragraph 32?

22          U.S. PROBATION OFFICER TURNER MEBANE:   At paragraph

23  No. 41 in the PSI, Your Honor.

24          THE COURT:   Adjustment for role in the offense.   All

25  right.   You scored him at zero.

1           U.S. PROBATION OFFICER TURNER MEBANE:  I would not

2  give him a role adjustment.  I did not feel like he was anymore

3  culpable than anyone.  I thought he was --

4           THE COURT:  -- or less.

5           U.S. PROBATION OFFICER TURNER MEBANE:  Or less.

6           THE COURT:  You are asking for a two-level decrease,

7  Mr. Lawlor?

8           MR. LAWLOR:  That's correct.

9           THE COURT:  Mr. Moomau, what is your position about

10 that?

11          MR. MOOMAU:  Your Honor --

12          THE COURT:  Well, two levels under the guidelines

13 that he has cited.  What is your position?  You are saying

14 minor role.

15          MR. MOOMAU:  Your Honor, just to go over the facts in

16 this case, we have --

17          THE COURT:  Well, maybe the better way to do this is

18 to allocute and then revisit this after because we are going to

19 get into the discussion, I think, on allocution.  What do you

20 think?

21          MR. LAWLOR:  That would be fine with me, Your Honor.

22          THE COURT:  Well, all right.  Hold on.  All right.

23     Well, insofar as I am ready to adopt the presentence

24 investigation, at least at this point, I would find a criminal

25 history category of II, and we will revisit that finding after

1  we hear you on allocution if that's okay.

2       So, are you ready to -- and by the way, is there any --

3  are there any witnesses who are going to be called?  At one

4  point, there was a reference to the victim's mother.

5            MR. MOOMAU:  Your Honor, there are members of the

6  victim's family present.  They have told me they do not desire

7  to address the Court.  There was a victim's impact statement

8  submitted, and they are agreeable and willing for the Court to

9  consider that.

10           THE COURT:  Well, just so that I have it, I have got

11 a lot of numbers that are -- I don't know that I had a total

12 that's set forth here.

13           MR. MOOMAU:  And, Your Honor, I have a total.

14           THE COURT:  Hand that to the defendant and hand a

15 copy to me.

16           MR. LAWLOR:  I have it, Your Honor.

17           THE COURT:  Hand it up to the clerk.  Hand it to the

18 clerk.

19           MR. MOOMAU:  This was calculated in a, I'd say a

20 codefendant's sentencing case that was in front of Judge Titus.

21 The total would be 6100 we would be seeking for restitution.

22           THE COURT:  What is your position relative to that,

23 Mr. Lawlor?

24           MR. LAWLOR:  We have no objection to that.

25           THE COURT:  I will address that as a matter of

1    restitution, then, when we get there.

2         All right.  Are you ready to allocute?

3         I assume that you, then, are agreeable to $6100 in

4    restitution?  Therapy sessions, 15 times $20 each for the

5    mother; lost property; an iPhone of 300; and funeral expenses,

6    etc., 5500; a total of 6100.

7         Otherwise, go ahead on allocution for the government,

8    then.

9              MR. MOOMAU:  Yes.  Thank you, Your Honor.

10        Your Honor, in the plea agreement, we have talked about

11   disputing one factual matter.  The government is willing -- is

12   going to go just with the facts as they appear in the plea

13   agreement.  Anything that's in dispute, we are not going to be

14   presenting anything on.

15        But even if you look at the facts that are agreed to in

16   the plea agreement, Your Honor, you have two murder

17   conspiracies that this defendant was involved in.

18        Now, the first one happened February 28, 2013.  And in

19   that particular case -- and the Court heard some of that case

20   discussed at the trial of the codefendant, Landaverde-Giron --

21   but what the evidence would show there is that there were four

22   MS-13 members driving around looking for rivals to kill.  And

23   one thing about when they look for rivals, it's not an exact

24   science.  Someone can be picked out because they have long

25   hair.  Someone can be picked out because they are wearing the

1  wrong shoes.  Someone can be picked out because they are

2  wearing a baggy set of pants or a color.

3          THE COURT:  A rival gang member.

4          MR. MOOMAU:  Yeah, a rival, what they call chavalas.

5  And on this particular night, what made this car dangerous was

6  the fact that they had a gun and it was a gun that Mr. Salazar

7  had brought and had introduced into the group.

8          Now, I will tell the Court that at that particular time,

9  as far as seniority within the gang, Mr. Salazar was the lowest

10  level in that particular car.  And I put it and I agreed to it

11  in the Statement of Facts, he was not the one that fired the

12  shots; however, he brought the gun.  He got out of the car with

13  the person who did fire the shots, and then he took the gun

14  afterwards back to his clique, and that particular gun was used

15  later in other murders, in the --

16          THE COURT:  The gun belonged to the gang, the clique?

17          MR. MOOMAU:  To the Normandie Clique.  It was used in

18  the Frederick murder that happened, I think that was in

19  November of 2014 -- '13, and then it was used in the shooting

20  in Hyattsville in July of 2014, another one where the defendant

21  was present at.

22          Now, what is significant when the Court decides a

23  sentence that is appropriate is that even after the February

24  28, 2013, attempted murder -- or conspiracy in the murder that

25  resulted in a minor human being being killed just because he

1  was suspected of being a chavala is that right after that,

2  Mr. Salazar could have taken one of two paths.

3       He could have taken a path, Man this scares the heck out

4  of me; the last thing I want to do is to be part of this; I

5  just want to stay away from it, but he grew in stature after

6  that, and you find him in July of 2014 kind of leading the

7  charge again where in Hyattsville, there was an attempted

8  shooting of three suspected chavalas.  One of them was shot

9  like seven times.  One of the shots hit him in the face.

10           THE COURT:  Was he the shooter?

11           MR. MOOMAU:  No, he was not.  He was with the group,

12 though, when they approached the person with the two guns and

13 shot.  But no, he was not the shooter.

14           THE COURT:  Did he actually carry the gun, handle the

15 gun?

16           MR. MOOMAU:  He -- the government's evidence would be

17 he had one of the firearms before when they were driving

18 around.

19      The Court's indulgence.  I am not going -- I don't want

20 to go far beyond the agreed Statement of Facts.

21      But our testimony -- and I think it was testified maybe

22 during the Landaverde-Giron trial that Salazar showed one of

23 the other individuals who did the shooting how to use the

24 firearm because he indicated he had never fired a gun before.

25           THE COURT:  Showed him in the car at the time or some

1  time prior?

2          MR. MOOMAU:  In the vehicle, in the Jeep.  Yes.  I

3  believe -- and I'm going by memory of the testimony during the

4  Landaverde-Giron trial of the government witness Zamora-Flores.

5          The defense is seeking a two-level downward departure,

6  and really they are seeking it because he wasn't the shooter.

7  And admittedly to the government, even according to the

8  government's own witness, when it got time to get out of the

9  car and do the shooting on February 28th, according to the

10  government's witness, he hesitated, Salazar hesitated.

11          THE COURT:  Hesitated getting out of the car?

12          MR. MOOMAU:  According to the government's witness,

13  he just hesitated as if he was afraid of going through.

14          THE COURT:  What did he do post shooting that first

15  incident?  Did he get back -- was he on the scene during the

16  entire shooting?

17          MR. MOOMAU:  He was.  He got out of the vehicle after

18  the person took the gun from Mr. Salazar and went out after the

19  suspected rivals.

20          THE COURT:  Was there a chase involved of some sort?

21          MR. MOOMAU:  No chase.  They approached -- the

22  government -- or the shooter and Salazar approached the two

23  individuals.  One of them said --

24          THE COURT:  Well, how many people were with the

25  defendant?

1          MR. MOOMAU:  Yes.

2          THE COURT:  How many were with him?

3          MR. MOOMAU:  He and one other.

4          THE COURT:  One other?

5          MR. MOOMAU:  Yes.

6          THE COURT:  The shooter?

7          MR. MOOMAU:  Yes.

8          THE COURT:  And they approached the defendant (sic)

9  and then what?

10          MR. MOOMAU:  They approached the victims.

11          THE COURT:  Sorry, the victims.  I misspoke.

12          MR. MOOMAU:  The shooter said something in Spanish.

13  That's what the surviving victim had said.  He -- the shooter

14  then pulls out the gun and shoots the deceased victim who ran

15  and collapsed maybe half a block later.

16          THE COURT:  And what did the defendant do?  He was

17  just there the whole time?

18          MR. MOOMAU:  Yes.  He was there the whole time with

19  the shooter.  Then they both ran back to the --

20          THE COURT:  Did they not approach the body or

21  anything?

22          MR. MOOMAU:  No.  I don't know that part because the

23  other --

24          THE COURT:  There were just two of them?

25          MR. MOOMAU:  Yes.

1       THE COURT:  They drove together.  You don't know

2   who -- you say that the defendant showed the shooter how to use

3   the gun while they were in the vehicle?

4       MR. MOOMAU:  There were actually four people in the

5   vehicle.  This is the first murder conspiracy.  It was Salazar

6   and three other persons.

7       THE COURT:  That's the first one where he brought the

8   gun?

9       MR. MOOMAU:  Right.

10      THE COURT:  I thought you were at the attempted

11  murder.

12      MR. MOOMAU:  Oh, no, Your Honor.  No.  I was at the

13  first one.  Now, for the second --

14      THE COURT:  So the four got out and immediately

15  approached the victim and shot him and he was killed; is that

16  right, the first --

17      MR. MOOMAU:  For murder -- I am going to say murder

18  one, four people were in the car.  Salazar and the shooter get

19  out.  Shooter has the gun.

20      THE COURT:  The other two stay in the car?

21      MR. MOOMAU:  The other two stay in.  And then after

22  the shooting --

23      THE COURT:  There is no chase involved as far as you

24  are concerned; they just get out and approach the victim?

25      MR. MOOMAU:  That's right.

1          THE COURT:  Go ahead.

2          MR. MOOMAU:  That's one.  And then the second one

3    that happened in July of 2014, again, there are four people --

4    it's kind of cloudy -- at least four people.  Three of them get

5    out of the vehicle, approach the --

6          THE COURT:  Is the defendant one of them?

7          MR. MOOMAU:  Yes.  Two of them are armed with

8    handguns.  This defendant didn't have a gun.

9          THE COURT:  All right.

10          MR. MOOMAU:  And they approached the -- the three

11   suspected rivals, two of them shoot them, and then they all run

12   back to the getaway vehicle and drive away.  And --

13          THE COURT:  Did the defendant drive the car?

14          MR. MOOMAU:  Excuse me?

15          THE COURT:  Was the defendant the driver?

16          MR. MOOMAU:  No.  He wasn't the driver.

17          THE COURT:  That's murder two or attempted murder

18   two?

19          MR. MOOMAU:  Yes.  That's the murder conspiracy two.

20          THE COURT:  And what about the other conspiracy, what

21   was the role of the defendant there?

22          MR. MOOMAU:  Well, in the Statement of Facts, we just

23   have two murder conspiracies, and that's what he had admitted

24   to.

25          THE COURT:  There was not a third?  Is that part of

1   the --

2            MR. MOOMAU:  No.  There is not a third involving this

3   defendant, just those two.

4            THE COURT:  Just the two?

5            MR. MOOMAU:  Yeah, which is substantial as far as --

6            THE COURT:  All right.  So you are arguing against

7   any kind of decrease for minor role?

8            MR. MOOMAU:  I believe, Your Honor, if there is any

9   decrease, because he wasn't the shooter, it shouldn't be any

10  more than one, and that's what I put in the sentencing

11  memorandum.

12           THE COURT:  My guess is it would not have any effect

13  on the guideline range?

14           MR. MOOMAU:  It probably would not now.  With the

15  criminal history staying at II, it probably would not have any

16  effect, Your Honor, no.

17           THE COURT:  All right.  Mr. Lawlor, do you want to

18  respond to that presentation?  I mean, I am trying to

19  understand if what he says is accurate, your argument appears

20  to be that compared to whoever pulled the trigger, his role was

21  minor, something like that?

22           MR. LAWLOR:  It is that, Your Honor, in a nutshell.

23  It goes a little beyond that, but it's hard to just focus on

24  this in the totality of the allocution about Mr. Salazar.  But

25  just to try to hone in on this, I mean, I dispute the notion

1   that, you know, Mr. Salazar brought the gun.  As the government

2   indicates, in response to the Court's question, this was the

3   clique's gun, and the notion that, you know, but for

4   Mr. Salazar having this gun, that the --

5          THE COURT:  Well, I don't have to buy whether or not

6   he owned it, but if he brought it, that's a factor.

7          MR. LAWLOR:  It certainly is a factor.  My point is,

8   Your Honor, I think the gun, as Mr. Moomau indicated, this gun

9   was thereafter used in other events.

10         THE COURT:  I am not sure that works in his favor.  I

11  mean, it seems to cut the other way if it was used --

12         MR. LAWLOR:  I don't think it does.  My point is,

13  Your Honor, you know, Mr. Salazar had a very minimal role in

14  the actual homicide.  He was present.  He did not shoot at the

15  victim.  He did not approach the victim.

16         Obviously, I am not here asking him to receive a

17  commendation for participating in a murder conspiracy, but in

18  the totality of what's an appropriate punishment -- and I can

19  certainly compare this, Your Honor, to the sentence that

20  Ramos-Mejia got from Your Honor, which was admittedly only one

21  murder conspiracy, and in that case, the defendant was a

22  principal in the first degree, actually stabbed the victim.

23         So, you know, there are a multitude of distinctions

24  between that case and this one, but I do think, as to both of

25  these cases -- and I am certainly not arguing that, as I said,

1 | that Mr. Salazar's conduct should be lauded in any way -- but I
2 | do think that the fact that in both of these instances, he did
3 | not fire a weapon is something that the Court should consider
4 | in determining what is a reasonable sentence.

5 | I will also say, Your Honor, as to the first murder
6 | conspiracy, that it sort of goes beyond the fact that he didn't
7 | shoot.  A witness testified, or at least statements were given
8 | to us in *Jencks* that other members of the clique referred to
9 | Mr. Salazar as a coward.

10 | It wasn't just that he didn't fire.  He appears to not
11 | have had sort of the -- I don't want to say he didn't have the
12 | fortitude to murder because that makes it sound like having the
13 | fortitude to murder is something that is commendable.  But I
14 | would say, Your Honor, it goes to the fact that -- again,
15 | getting sort of to the totality of an allocution -- that when
16 | Mr. Salazar, notwithstanding his, you know, joining of the gang
17 | and participation in the conspiracies is not sort of stone cold
18 | like you will see in some of the other members and some of
19 | these other activities which we are all too familiar with.

20 | THE COURT:  All right.  You are arguing that he was a
21 | minor participant, not a minimal participant as I understand
22 | it.  You are asking for two levels rather than four?

23 | MR. LAWLOR:  I am asking for two.  And, again, Your
24 | Honor, I obviously have more to say about the history and
25 | characteristics of Mr. Salazar, but --

1           THE COURT:  We are talking about the offense now.

2           MR. LAWLOR:  Yes.  Just in terms of the offense.

3  And, you know, this does partially capture the other argument

4  in terms of overrepresentation even as Mr. Moomau indicated.

5  While we are asking the Court to depart two levels, which would

6  bring us to even a Criminal History Category II, a base offense

7  of a 40, and the bottom of that range would be 324 months, if

8  he was a Criminal History Category I and Your Honor departed

9  one level, as the government seems -- I don't know that

10 Mr. Moomau said that that was appropriate, but, rather, if the

11 Court thought it was appropriate, the government's arguing that

12 no more than one level should be applied.  If the Court thought

13 either under -- I understand the Court to have rejected my

14 guideline argument, but if the Court thought analyzing the

15 defendant's criminal history as part of the 3553(a) analysis

16 that this is more akin to an individual Criminal History

17 Category I when the bottom of that range, yet again, is 324

18 months.

19          THE COURT:  Well, here is the problem I have got.  I

20 mean, in -- the defendant is there in a group bent on murder

21 from the start.  This isn't something that suddenly occurs with

22 him present.  They are looking for chavalas, as I understand it

23 at this point, to find somebody to kill.  That's essentially

24 what they were setting out to do.

25          So he's there as one of the intimidating group whether he

1    pulls the trigger or not.  And in this particular case, as I

2    understand it, he had the weapon, did he not?  Isn't that the

3    argument, that he then handed it over?  Or are you into the

4    conspiracy?  Let me be clear about that.

5          MR. MOOMAU:  Yes, Your Honor.  For murder conspiracy

6    number one, he had the gun that day separate and apart and

7    brought it to the group.

8          THE COURT:  So he's not somebody who doesn't know

9    what's about to develop.  They are bent on murder and he's

10   bringing the execution -- the executing instrument with him.

11   Now, is he a minor role because he hands it over to somebody

12   else who pulls the trigger?  Is the person who pulls the

13   trigger more culpable than he?  Maybe.  Is he less culpable

14   overall than that?  I think not.

15         He is definitely, in my view, involved in the conspiracy

16   to commit murder.  There is just no question about it.  He

17   brings the weapon that effects it.  So to say I was along for

18   the ride -- even if he was a minor guy in the operation

19   overall, that is, with MS-13, he was looking, as it seems to be

20   part of the case, to improve his street cred., to improve his

21   credibility, to show that he's a tough guy who can go out and

22   commit murder.

23         There is nothing that diminishes him -- just because he

24   didn't pull the trigger doesn't make him overall less

25   responsible for conspiracy to murder.

1          So, in my view, there is no reason to give a two-level

2   decrease, and under the guidelines, I don't think it merits it.

3   I don't think he has a minor role.  He has, so to speak, I

4   guess a lesser role maybe than the guy who pulls the trigger,

5   but not by much.  I am not going to grant a two-level decrease.

6          That said, I think I am ready to make the final

7   calculations here.  So the Court, then, ends up with the

8   guidelines, as calculated, it is a total offense level of 42

9   and a criminal history category of one (sic), the guideline

10  range for custody is 360 months to life, the supervised release

11  range is two to five years, the fine range is 25,000 to

12  $250,000.

13         All right.  Further allocution, then?  Are we back with

14  -- is the government, then, otherwise -- well, I hadn't really

15  heard your specific recommendation.  Perhaps we are back now to

16  the government with more to be said, or what do you seek?

17              MR. MOOMAU:  Your Honor, I can finish allocution.

18              THE COURT:  You have finished allocution?

19              MR. MOOMAU:  No.

20              THE COURT:  Let's go to your allocution then.

21              MR. MOOMAU:  Okay.  Your Honor, one thing I wanted to

22  -- the Court's finding was a Criminal History Category II,

23  correct, based on the illegal reentry conviction?

24              THE COURT:  I made that statement already.  I made

25  that finding.

1          MR. MOOMAU:  I just wanted to make sure.

2          One thing I wanted to correct, and I know the minor role

3    reduction request by Mr. Lawlor just applied to murder

4    conspiracy number one, but for murder conspiracy number two, I

5    said earlier that during the Landaverde-Giron trial, a

6    government witness said that Mr. Salazar showed him how to use

7    the gun that was used in that attempted murder, and I still

8    believe that's what was testified to, but I am not 100 percent

9    positive because we have talked to those witnesses so many

10   times.  I know he testified.  Salazar wasn't on trial there.

11   So I just want to make sure I correct that so that there is no

12   -- so that that didn't influence -- it doesn't influence the

13   Court's sentencing.

14          THE COURT:  Well, I said it did, but if you remove

15   it, I am still at the point that he was in the gang that came,

16   that was bent on homicide, and committed it, so I don't really

17   think it diminishes my ultimate conclusion.  It fortifies it if

18   anything.

19          MR. MOOMAU:  I just wanted to clarify that, Your

20   Honor.

21          As far as the other sentencing factors under 3553, I

22   touched on it earlier that as far as Mr. Salazar's history and

23   characteristics -- now, the defense put a lot of information in

24   its sentencing memo, and they have access to information that

25   the government doesn't have there, but as far as his

1    affiliation with MS-13, it basically drug him down, and he was

2    a willing participant in all of it.

3          It started back in February of 2013 and it just kept

4    escalating.  And at some point, Mr. Salazar grew to the point

5    of being First Word of the Normandie Clique of MS-13.  He was

6    in on all the decisions, the important decisions that were

7    being made as far as the clique.  And when the Court imposes a

8    sentence, that is one of the characteristics that the Court

9    needs to consider is the leadership role that he had with the

10   clique either as the First Word, or, as my colleague informed

11   me, he may have been the Second Word instead of the First Word.

12   I think Mr. Garcia-Miranda and he kind of shared that role of

13   being First Word and Second Word.

14         In the end, Your Honor, you are going to have to

15   determine what is an appropriate sentence.  The government

16   believes the guideline sentence is appropriate in this case and

17   that nothing below the guidelines should be even considered.

18         The guidelines start at 360 and go up to life.  I have

19   read the presentence report.  At some point, at least during

20   his conversation with the probation officer, it seems like

21   finally Mr. Salazar got how much of a mess he has made of his

22   life because of his affiliation with MS-13 and what it actually

23   got him, and for that reason, Your Honor, and based on his

24   acceptance of responsibility, we are agreeable and requesting a

25   sentence of 360 months.  We believe that that is a substantial

1   sentence.  We believe that as far as law enforcement,

2   protection of the public, and sending a message, that that -- a

3   sentence of 360 months would do that.

4        Now, it's going to be a long time before Mr. Salazar

5   would get out, but he will still have a good bit of his life

6   left and he will still be able to take advantage of a lot of

7   programs that would be offered to him in the Bureau of Prisons

8   as recommended -- or as, I guess, advocated in the defendant's

9   sentencing memoranda.

10       There was a recommendation in the presentence report of

11  mental health counseling based upon some matters that were

12  stated in the presentence investigation, and the government

13  would second that and ask that those issues be dealt with and

14  that he have access to any and all treatment he would need for

15  that.

16       Thank you.

17            THE COURT:  Mr. Lawlor.

18            MR. LAWLOR:  Your Honor, I am sort of saddened to say

19  that this is the second racketeering sentencing that I have

20  been in in the last six days.  The other one was last week in

21  front of Judge Bredar dealing with a BGF case.  And the

22  parallels are striking and unsettling to some degree.

23       You know, there is a lot of noise in this day and age

24  about immigration, and, obviously, I do appreciate the

25  prosecution worthiness, if you will, of these prosecutions of

1  MS-13, but the news, I think, focuses on, as was the case last
2  week when we were talking about BGF, some of the ramifications
3  of what happens when people who are in their early 20s join
4  gangs and commit criminal acts.

5       But what I feel like gets glossed over, which we are
6  trying to highlight to Your Honor and was, like I said,
7  strikingly similar in my conversation with Judge Bredar last
8  week, is, you know, what led Mr. Salazar to this point?  And if
9  you strip away the vitreal about immigration, what you are left
10 with is, you know, a young man who came with nothing, had none
11 of the sort of basic necessities of human life that we all just
12 take for granted as sort of an understatement, you know, a safe
13 home, loving parents, access to food, shelter, water, access to
14 a solid education.

15      And we all know, without getting too far afield, that
16 more often than not the people that we encounter in the world
17 who are provided access to things like a good education, good
18 role models, two parents who love and support them, that it's
19 unlikely that someone like Mr. Salazar, for example, had he
20 been provided those things, would be here today, but that's not
21 the course that his life took.

22      So I was reading in the *Washington Post* I think yesterday
23 or today -- and, you know, I only live in the community and I
24 only read the *Post* so I only know about MS-13 from reading the
25 *Post* and my work as a criminal defense lawyer as it impacts

1   mainly, anyway, the community here -- but this article dealt

2   with a middle school right here in Prince George's County and

3   talked about the influx of MS-13 there and how it's impacting

4   these young kids.

5         And so when we read an article like that, we are troubled

6   by that because we don't want kids who are in the 6th or 7th or

7   8th grade, which is what they'd be in middle school, to have

8   these influences and then end up in the gang because we want

9   better for them, number one.  We don't want to have to deal

10  with the criminal conduct.  We don't want to have to be in a

11  courtroom talking about what's a reasonable sentence.  But at

12  that stage in their life, that's not our concern.

13        Our concern is when we are talking someone who is 11 or

14  12 or 13 is the fact that they are an innocent child and we

15  want a good life for them, we want that for them, and as a

16  society, we desire to protect that.  We hope and expect that

17  their parents will, but we live in a community and we educate

18  our children as part of a community, and part of that sort of

19  social contact is that we are going to, as a community, try to

20  keep them safe and free from all kinds of harm, including the

21  inundation of gang activity in middle schools.

22        And that was Selvin's life in El Salvador where there is

23  no escape from this.  There is no escape from gang activity.

24  And should he, as Mr. Moomau said, have had a realization at an

25  earlier time in his life, come to the United States and gotten

1   a job as he did, and, you know, learn the lesson and stayed

2   away from any kind of gang activity, particularly this kind of

3   gang activity which led to death and destruction, of course,

4   but I think we are naive to think that we should only focus on

5   the things that he did and leave ourselves sort of immune to

6   the consequences of life in certain societies which leads young

7   men into criminal activity.  And let's not forget that

8   Mr. Salazar was only 21 and 22 when he participated in these

9   criminal acts.  A man, yes, but still a very young man.

10          I will say, Your Honor, though, that, you know,

11  Mr. Madiou and I have been in this case for some time now.  I

12  think Mr. Salazar came into federal custody in July of 2015, so

13  we are coming up on three years, which is a fairly

14  extraordinary amount of time for me to be involved in a case.

15  And, obviously, we were headed to a trial in this case.  It had

16  been continued many times with various scheduling conflicts

17  amongst the parties and that was part of the issue.  But as a

18  result, you know, I have gotten to watch this still young man,

19  you know, be confronted with difficult decisions, discuss the

20  things that led to his gang life, get his thoughts on, you

21  know, the decisions that he made.

22          And I can say, Your Honor, confidently that, you know,

23  there is a lot more -- that Mr. Salazar is much more layered of

24  a human being than just these awful things that he did.  You

25  know, he is an extremely intelligent person.  He is a very

1   religious person.  And I know most importantly, Your Honor, he

2   is someone with a tremendous amount of remorse for the things

3   that he's done, and, you know, has learned from this, which

4   sounds hollow to say, Well, I have learned from this.

5        And I -- I hope that I can be eloquent enough to share

6   with the Court that this process isn't something I mean to be

7   trite about, that it is watching a young man come to grips with

8   things that he's did and feel genuine human remorse; be

9   regretful, yes, that he joined a gang; be regretful, yes, that

10  he's going to be incarcerated; but also be regretful for the

11  things that he's done.

12       And I can say, Your Honor, you know, Mr. Maidou prepared,

13  we talked about the case, you know, and I come over here with a

14  really heavy heart because it saddens me.  I mean, again, no

15  one here is going to applaud the things that Mr. Salazar did.

16  They are, you know, worthy of condemnation, and he understands,

17  as I do, that the sanction for participating in conduct like

18  this is and has to be fairly dramatic.

19       But, Your Honor, I do believe that given the

20  circumstances of Mr. Salazar's life, the positive decisions

21  that he's made, including accepting responsibility in this

22  case, and the growth that he's undergoing still warrants a

23  departure from the guideline range in this case.

24       I did bring to the Court's attention the sentence in a

25  codefendant's case.  Again, it's hard to compare all these

1   cases, Your Honor, because there are so many moving parts, a

2   number of conspiracies that people were involved with and their

3   particular role, but although the Court didn't think that

4   varying, or, rather, departing from the guidelines on either

5   criminal history or for minor role was warranted, I do think

6   that, as part of the soup that is the Court's analysis under

7   3553, that this is a case that warrants a variance below the

8   guideline range.

9        Whatever sentence the Court imposes is going to be a

10  severe one, and Mr. Salazar knows that, but I do think the

11  circumstances of his life, his growth, and his acceptance of

12  responsibility warrant a variance below the guideline range.

13       The last thing I will say, Your Honor, at the risk of

14  sort of ending on a very minor point, is that Mr. Salazar has

15  been confined at Chesapeake Detention Facility for the better

16  part of the last two years.  I know the Court is aware, and,

17  therefore, I won't belabor the conditions of confinement there,

18  but I am asking the Court, Mr. Salazar is asking the Court to

19  factor those conditions as well into what it believes

20  ultimately is a reasonable sentence in this case.

21       Ultimately, I am asking Your Honor to vary below the

22  guideline range in this case for the reasons that the Court can

23  see from the presentence report and are outlined in the

24  allocution today.

25       Thank you, Your Honor.

1          THE COURT:  Mr. Salazar, you have an opportunity to

2     address the Court before I impose sentence.  Would you like to

3     say anything?

4          THE DEFENDANT:  Yes.  First of all, I want to thank

5     God for allowing us all to be here in good health.  I feel

6     pleased that I am able to speak with you today so that I can

7     express what I need to say, so that you will be able to hear

8     what I am saying, and for this reason, Your Honor, I ask you to

9     please listen to me with great patience because it's not easy

10    for me to speak in the situation that I find myself in today,

11    and I am not so good at expressing myself, but I will do

12    everything I can.

13         Your Honor, I come from a country where our daily bread

14    is violence and we see ourselves to be obliged to take part in

15    these ugly organizations because we don't have another out.

16    It's easy for you to judge me and see me as a monster, as a

17    danger, but the reality is that I am not a danger or a monster.

18    I am a human being who has made mistakes, and even though I

19    know that the things that happened, there is no way to justify

20    what I did.

21         Today, in this place, I could say a thousand words, but

22    it would not make up for the mistake that I have made.  This

23    does not mean that I am not sorry and repentant.  I am beyond

24    repentant.  Every single day, every second, I think about this

25    constantly and the pain that I have caused.  I am not sorry

1  because I am in jail; rather, because of the pain that I have

2  caused these parents.

3       I didn't kill anyone, nor did I try to kill anyone, nor

4  have I been a leader of a gang, but I did participate in the

5  conspiracy.  That is why I have accepted my guilt.  And I do

6  ask forgiveness from the parents because I can honestly say

7  that today I have realized that there is nothing more painful

8  than to see a mother suffer.

9       Honestly, I am very sorry.  I am a human being.  God

10  willing, I will be given a new opportunity to be a new person

11  and be able to teach young people how to make better decisions.

12  Not because someone has told me this, but because I have

13  experienced it.  It's difficult to move ahead and progress.

14  When you are not born into a whole, healthy place and there is

15  no one you can count on, Your Honor, I know that -- or I

16  believe that you are a father, and you know that we, as

17  children, as young people, make mistakes.  We make mistakes.

18  But as a father, I believe that you will always want the best

19  for your son.  I never had a father, sir.  I don't know what it

20  means to have a father.  But I believe that fathers always want

21  the best for their children.

22       Your Honor, I don't have the power to convince you, but I

23  can tell you that I am another person, that the person who

24  existed on the outside has died, and now I am a new person and

25  I want to live for the glory of God.  I hope that you will have

1   mercy on me.  I know that I don't deserve it, but I hope you

2   will find it in the depths of your heart to see that I am just

3   a young man who is very sorry for what he has done, and I have

4   begun and I am willing to begin a new life.

5        I am sincerely so sorry for what I have done.  It's

6   difficult to turn around and look at you and tell you this, to

7   tell you everything that I want to, that your -- your family

8   member will never return.  I don't have the power to go -- to

9   bring the past back and to have stopped your tears from

10  falling.  I wish that your tears could be changed to smiles.  I

11  am very sorry, honestly.

12       Your Honor, you may -- even if you give me the highest

13  sentence in the world, nothing will repair the mistake I have

14  made.  You are the one who judges.  You are the one who decides

15  what I should be given according to my acts and what I truly

16  deserve.  And thank you for having the patience to listen to

17  me.  I hope one day that sun will shine -- the sun will shine

18  again on my face.  God bless you and hope you are able to

19  progress in life.

20       That's everything.  Thank you very much for your time.

21            THE COURT:  All right, sir.  Have a seat, please.

22       Is anyone here on behalf of the defendant's family, or is

23  everyone here in the back the victim's family?

24            MR. LAWLOR:  Those are the victim's family, Your

25  Honor.  The defendant's mother does live here in the United

1  States.  We have had contact with her.  She does have a

2  relationship with Mr. Salazar, but she couldn't be here today.

3              THE COURT:  Is Ms. Umon [phonetic] in the court,

4  Norma Umon?

5              MR. UMON:  I am -- the father and sister of the

6  victim, the father and the sister of the victim.

7              THE COURT:  Who is Norma Umon?  Is it the mother?

8              MR. MOOMAU:  Yes.

9              THE COURT:  Is she not here?

10             MR. UMON:  No.  My wife, she didn't come.  She was

11 working.

12             THE COURT:  What is your name, sir?

13             MR. UMON:  Jose Reyes.

14             THE COURT:  You are the father of the victim?

15             MR. UMON:  Yes.

16      (It is the policy of this court that every guilty plea

17 and sentencing proceeding include a bench conference concerning

18 whether the defendant is or is not cooperating.)

19             THE COURT:  Mr. Salazar, I know you have talked to

20 your attorneys about sentencing guidelines, and the idea of

21 sentencing guidelines is that people who commit the kind of

22 crime that you did commit -- crimes, really -- should be

23 sentenced by recommendation to a certain range of

24 incarceration.  And in your case, the guidelines, which I do

25 not compose -- they are composed by counsel of sentencing

1   guideline individuals: judges, lawyers, academics, and

2   others -- suggest that what you did merits a sentence of 360

3   months to life.  That's before I even get my hands on the case

4   and know about it.

5          So what do I do with those guidelines?  The lower -- they

6   are not binding, but they are to be seriously considered by me

7   and I ought to have a good reason for departing, not that I

8   can't depart, but I need to have a -- should have a sensible

9   reason for doing it.  So 360 months, 30 years, is the bottom

10  line.  Life is life, as long as you live, so keep that in mind.

11         There are factors that the Court is supposed to consider

12  given what the guidelines are.  And the first factor is the

13  nature and circumstances of the offense.  This is under 18,

14  United States Code, Section 3553.  All right.  What are the

15  nature and circumstances of the offense?  One murder and at

16  least one attempted murder.  Pretty serious.  You can't get

17  more serious than that, really, unless there are multiple

18  murders.  That's about the most serious kind of offense that

19  can be committed.  It's not even theft, which is more leniently

20  treated.

21         So that's what we start with, its very nature, and the

22  circumstances of the offense, that you were a member of MS-13,

23  which is a scourge.  I mean, MS-13 is turning our country

24  inside out.  I mean, you had opted to belong, and you said you

25  were forced to and you had a difficult life and so on;

1   meanwhile, you are just wreaking havoc on the community.  You

2   are killing rival gang members.  You are killing people you

3   pick at random to show your manhood to belong to this group.

4   You don't like it if somebody wears colors that you don't like.

5   You don't like it if they make a hand signal that you don't

6   like.  It's crazy.  There hasn't been anything like that in

7   this country before.

8        Now, when I looked at your history and characteristics, I

9   understood you had a very difficult childhood.  No question

10  about that.  And you may have been forced to join MS-13.  Look

11  at it from the standpoint of the victim, his family.  You know

12  what you say to them in effect?  Look, you know, I killed your

13  son but I couldn't help myself.  I had to do it because, you

14  know, I had a bad childhood, it was rough on me.  That's why I

15  killed your son.  I'm sorry.  Think about how illogical that

16  is, how unreasonable.

17       If you have a sister, let's take a sister, and someone

18  said I had to kill you because, you know, I had a bad

19  childhood, it doesn't work.  That's not the way logic in any

20  country works.  And that's what you have done here.  You say

21  you have forgiven -- you have remorse, and the answer is maybe.

22       The problem is you have done things that are so

23  horrendous, I don't know whether I am ready to overlook that or

24  not.  It's not for me to show you mercy.  I mean, that's done

25  at the end of your life, I suppose, wherever you might go.  I

1   am supposed to apply the principles of rule, rules and

2   regulations of the community, and you have offended the

3   community in a grievous way.

4       And your colleagues at MS-13 are just tearing our country

5   apart.  For what?  To show that you are strong?  To give you a

6   family?

7       I mean, really, you know, the country is going to react

8   violently ultimately against you and your MS-13.  They are

9   going to declare war on you.  So while you go around swaggering

10  and do what you and your colleagues do, it isn't going to end

11  there.  The country is literally up in arms about what's going

12  on with MS-13 and all because you are trying to prove that you

13  are tough guys.  That's the point of it all.

14      And what does it -- what does it add?  To say I'm sorry,

15  maybe you are, maybe you aren't.  You do face a serious jail

16  term.  But it's hard for me to say, Well, let's give you some

17  credit for your difficult childhood; let's give you some credit

18  for maybe not being the trigger man.  I can't do that.  The

19  community would never accept that.  That's not my role.  Maybe

20  religiously there is some balm for you in future, but it's not

21  here in this court.

22      I am here to apply the rules.  I am here to protect the

23  community.  And I have got to tell you, and your colleagues

24  need to understand this as well, that you are -- your fate will

25  -- is coming.  MS-13 is really going to be, in my view, the

1 victim itself of a very serious reaction by the country.  So
2 that's what I see your situation as.

3       Your history and characteristics, frankly, don't persuade
4 much at this point even though you may be resourceful --
5 remorseful, and I don't know whether you are or not.  That's
6 going to take a lifetime, 30 years at least, anyway, for you to
7 determine.

8       And, of course, I need to not only deter -- punish you I
9 think is one component, where one does talk about punishment in
10 this case, but to deter you from doing other bad acts.  I mean,
11 I don't know whether you couldn't walk out here today and do
12 the same thing you have done before.  Most importantly, I think
13 I need to say to your colleagues, your MS-13 colleagues, We
14 won't tolerate this.  There is just no basis on which to tell
15 them that you can kill people and then come in and say I'm
16 sorry.  You may be sorry, but it's not enough.  It just doesn't
17 assist you in this court.

18       I do need to sort of keep in mind that you are going to
19 be treated more or less, according to your particular
20 circumstances, in harmony with the others that will be
21 sentenced in this Court, and there may be some conditions of
22 your supervised release that will help you improve your life,
23 including education and so on, but right now, there is really
24 no reason for me to depart from the bottom of the guidelines.
25       And I am going to impose a 360-month sentence on you in

1  this case with credit for time served.  And I don't know what

2  date that is, Mr. Lawlor.  You may know.  I don't want to

3  calculate it if there is intervening state time, but credit for

4  federal time served, federal time served in this case.

5          MR. LAWLOR:  Your Honor, in addition to the federal

6  time, there was an arrest date of July 21st, 2015.  I believe

7  the government would agree that he should get credit for time

8  served in Prince George's County on the case that was nol

9  prossed in favor of this prosecution.

10         THE COURT:  Won't the Bureau of Prisons take that

11 into account?  I always have a problem --

12         MR. LAWLOR:  I ask you to put it in the judgment

13 because --

14         THE COURT:  Unless the government agrees, I really

15 can't make that calculation.

16         MR. LAWLOR:  I do believe the government agrees.

17         THE COURT:  Do you have a date?

18         MR. LAWLOR:  January the 25th, 2015.

19         THE COURT:  Mr. Moomau?

20         MR. MOOMAU:  I have no -- can I confer with defense

21 counsel?

22         THE COURT:  Yeah.

23     (Counsel conferring.)

24         THE COURT:  Well, look, unless you can agree on the

25 date, I can't make this kind of a calculation on the fly.  I

1   would rather leave it to the Bureau of Prisons.

2          MR. MOOMAU:  Your Honor, he was incarcerated in

3   Prince George's County for a period of time based upon a murder

4   warrant that was included in this case that he pled to.

5          THE COURT:  Give me a date and I will put it in.

6          MR. MOOMAU:  January 25, 2015.

7          THE COURT:  All right.  Credit for time served since

8   January 25, 2015.

9          And then a five-year supervised release period to follow,

10   subject to the following terms and conditions:

11          You will abide by the general terms and conditions of

12   supervised release; commit no crimes, federal, state, or local;

13   possess no firearm or dangerous weapon.

14          You will pay restitution in the amount of $6100, that

15   will be a condition of your supervised release, and that will

16   be payable to the Clerk of the Court for distribution to Norma

17   Umon.

18          The -- in addition to those -- that special condition,

19   there are further conditions that the Court imposes.

20          You must participate in an educational services program

21   and follow the rules and regulations of that program.  This may

22   include high school equivalency preparation, English as a

23   second language, and other classes to improve your proficiency

24   in skills such as reading, writing, mathematics, and computer

25   use.

1          You must, as well, participate in a mental health

2     program, follow the rules and regulations of that program.

3     Your probation officer, in consultation with your treatment

4     provider, will supervise your participation in the program in

5     terms of naming the provider, its location, modality, duration,

6     intensity and such.

7          Further conditions include that you participate in a

8     vocational services program, follow the rules and regulations

9     of the program.  Such a program may include job readiness,

10    training, and development skills.

11         Of course, you must immediately report or continue to

12    report or surrender to the U.S. Immigration and Customs

13    Enforcement.

14         There is a detainer, I assume in this case, is there not?

15              MR. MOOMAU:  I am sure -- I believe there is, Your

16    Honor.

17              MR. LAWLOR:  An ICE detainer.

18              THE COURT:  An ICE detainer?

19              MR. LAWLOR:  There is.

20              THE COURT:  Well, in any event, to the extent that

21    there is any time that that might not apply, it is your

22    obligation to report to ICE, follow all instructions and report

23    -- all the reporting requirements.  Until then, the deportation

24    proceeding is completed.  And, of course, if you are deported

25    from the U.S., you must remain outside the U.S. unless legally

1  authorized to reenter.  If you do reenter, you must report to

2  the nearest probation officer within 72 hours upon your return.

3       I repeat again about not otherwise communicating with or

4  interacting with any known member of the gang without first

5  obtaining permission of the probation officer.

6       I have covered the mental health, vocation, reporting to

7  ICE, and deportation.

8       The Court assesses a $100 special assessment at this

9  time.

10      There is no fine imposed in the case.

11      There is the $6100 in restitution.  Any wages that you

12  earn while in custody will be applicable to your restitution.

13      No fine is imposed in the case.

14      I believe there was a waiver of appeal, but insofar as

15  any -- an appealable issue does appear to counsel, there will

16  be 14 days in which to notice an appeal.

17      Is there anything more from the government?

18           MR. MOOMAU:  No, Your Honor.  Thank you.

19           THE COURT:  From the defendant?

20           MR. LAWLOR:  Actually, there is one.  I'm sorry.  Did

21  you recommend placement to the Bureau of Prisons at Cumberland,

22  Your Honor?

23           THE COURT:  Where?

24           MR. LAWLOR:  Cumberland.

25           THE COURT:  I'm not catching it.

1        MR. LAWLOR:  I am asking the Court to --

2        THE COURT:  What's the name of the facility?

3        MR. LAWLOR:  Cumberland.

4        THE COURT:  Oh, Cumberland, you are saying.  You are

5    speaking like a local Marylander and sometimes I can't figure

6    that out.  I will recommend Cumberland.

7        Anything else?

8        MR. LAWLOR:  No, Your Honor.

9        THE COURT:  All right, Mr. Salazar, you have got a

10   long time to think about this.

11       MR. MOOMAU:  Your Honor, one thing.  There are some

12   remaining counts in the third superseding indictment.  Other

13   than Count One, we would move to dismiss those counts.

14       THE COURT:  Very well.  Anything else?

15       MR. MOOMAU:  No, Your Honor.

16       THE COURT:  All right.  Thank you.  We are in recess.

17       (The proceedings were concluded at 3:25 p.m.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3           I, Renee A. Ewing, an Official Court Reporter for

4   the United States District Court for the District of Maryland,

5   do hereby certify that the foregoing is a true and correct

6   transcript of the stenographically reported proceedings taken

7   on the date and time previously stated in the above matter;

8   that the testimony of witnesses and statements of the parties

9   were correctly recorded in machine shorthand by me and

10  thereafter transcribed under my supervision with computer-aided

11  transcription to the best of my ability; and that I am neither

12  of counsel nor kin to any party in said action, nor interested

13  in the outcome thereof.

14

15                      Renee A. Ewing

16
                        Renee A. Ewing, RPR, RMR, CRR
17                      Official Court Reporter
                        November 15, 2022
18

19

20

21

22

23

24

25